UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

TELEDYNE INSTRUMENTS, INC.,

       Teledyne,

v.                                  Case No:  6:12-cv-854-Orl-28TBS

JAMES L. CAIRNS, ABYSSAL
SYSTEMS, INC., KATHRYN F. KRAUSE
and THE STILLWATER TRUST,

       Defendants.

_____

## ORDER

This case comes before the Court on the following motions:

1.    Defendants' Motion for Miscellaneous Relief, Specifically Exclude Teledyne's Untimely Expert Reports and Related Testimony (Doc. 106);

2.    Teledyne's Motion to Compel Production of Forensic Images and Devices and a Production Log (Doc. 109);

3.    Defendants' Motion to Compel Entry on Teledyne's Privilege Log of Certain Documents Predating the Filing of the Lawsuit (Doc. 111);

4.    Defendants' Motion for Miscellaneous Relief, Specifically to Exclude Expert Rebuttal Reports (Doc. 112); and

5.    Teledyne's Amended Motion to Compel Production of Forensic Images and Devices and a Production Log (Doc. 120).

The Court has considered the motions, the papers which accompany them, and on October 3, 2013, heard argument from counsel.  (Doc. 155).

I.     Background

Teledyne Instruments, Inc. brings this action against Defendants Dr. James Cairns, Abyssal Systems, Inc., and the Stillwater Trust for declaratory relief, breach of contract, accounting, specific performance, conversion, tortious interference, and

conspiracy.  (Doc. 77).  Teledyne alleges, *inter alia*, that, after resigning from his position

with it in 2009, Dr. Cairns applied for a U.S. patent for an invention he worked on before

leaving the company and that, under the terms of his contract with Teledyne, it rightfully

owns any patent that might be issued for the invention.  (Id.).  Teledyne also alleges that

Dr. Cairns improperly made use of its confidential information.  (Id.).  Defendants deny

the material allegations of the complaint.  (Docs. 84, 97).

II.     Teledyne's Motion to Compel: Forensic Images and Devices and a
        Production Log

The first motion the Court will address is Teledyne's Amended Motion to Compel

Production of Forensic Images and Devices and a Production Log (Doc. 120).[1]  This

motion has two purposes: first, Teledyne wants the opportunity to inspect certain

electronic storage devices in possession of Defendants or, alternatively, forensically

sound images of those devices; and second, Teledyne seeks a production log of certain

documents Defendants have already produced.  (Doc. 120, p. 1).

A.     Forensic Images and Devices

Between June 3, 2013 and July 8, 2013, Defendants turned over more than 13,800

native files[2] in response to Teledyne's requests for production of documents.  (Doc.

_____

[1] This motion supersedes Teledyne's Motion to Compel Production of Forensic Images and Devices and a Production Log (Doc. 109).  The Court will **DENY** the original motion (Doc. 109) as moot.

[2] Technically speaking, a file's "native format" is the format in which it is originally created. The Sedona Conference Working Group on Electronic Document Production, The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document production, p. 62 (2d ed. 2007) available at https://thesedonaconference.org/download-pub/81.  For example, a document created in Microsoft Word will have a doc or docx native format.  When a file is converted from its original format (e.g., doc) to another format (e.g., pdf), the converted format is not the "native format," even if that is the only format in which the user keeps the file.  Id., p. 8 (explaining that "[t]he phrase 'ordinarily maintained' is not synonymous with 'native format'").

In this case, however, the parties appear to use "native format" to mean not the format in which a document is created, but the format in which the document is kept.  Many of the files produced in "native format" are pdf and jpeg files (see, e.g., Doc. 120-2, p. 23).  These formats are indicative of a file that has been converted from another format.  Cf. City of Colton v. American Promotional Events, Inc., 277 F.R.D. 578 (C.D. Cal. 2011) (party produced documents converted to TIFF or JPEG format rather than native format); Cenevo Corp. v. Southern Graphic Systems, Civil No. 08-5521 (JRT/AJB), 2009 WL 4042898 (D.

120-5, ¶ 8).  Each of these productions included a load file, referred to as a "DAT" file,

containing metadata.  (Id., ¶ 8)  The DAT files provided with Defendants' first two

productions include only the beginning and ending Bates numbers for the documents.

(Id., ¶ 10)  On June 21, Defendants produced a new DAT file "contain[ing] metadata for

previously produced documents," along with a .pdf file containing a chart displaying the

information in the DAT file. (Id., ¶ 11; Doc. 120-1).  This DAT file (the "Replacement

DAT") contains, for each document, the beginning and ending Bates numbers, date

created, date last modified, date last accessed, file name, and file path.  (Doc. 120-5,

¶ 11; Doc. 120-2).  The documents reflected in the Replacement DAT are stored on 18

different electronic storage devices (computers, external storage devices, and CD's) in

Defendants' possession.  (Doc. 145-1, ¶ 12).

Teledyne gave this information to its expert, Daniel L. Regard, who found that of

the 3,490 documents listed in the Replacement DAT, 1,680 had a created, last accessed,

or last modified date on or before December 31, 2009, which is the date Dr. Cairns' left

Teledyne.  (Doc. 120-5, ¶ 18).  According to Mr. Regard, this "suggest[s] that [Dr.] Cairns

came into possession of [these files] prior to the termination of employment." (Doc. 120-5,

¶ 21).  Mr. Regard observed that the dates created, last modified, and last accessed in

the Replacement DAT "are inconsistent with some of the data collected directly from the

native files." (Doc. 120-5, ¶ 16).  This "may indicate that certain files had a Created Date

or Last Modified Date even earlier than reflected in the Replacement DAT file." (Id.,

¶ 16).  He also noted that, of the documents with a last modified date preceding the

created date, 525 had a created date earlier than December 31, 2009 and 904 had a

---

Minn. Nov. 18, 2009) (party produced documents in pdf format instead of native format).  In this order,
except where otherwise noted, the Court will use "native format" and "native files" in the sense that the
parties are using these terms–in other words, to refer to files in the format in which they are kept.

created date in 2010 or 2011.  (Id. ¶ 21).  This would "suggest that [Dr.] Cairns moved and/or created files within his possession to new storage devices during his employment with Teledyne and during the two-year period following his termination." (Id., ¶ 21).  Mr. Regard also extracted metadata from the native files[3] themselves and compared the dates indicated in that metadata to the dates in the Replacement DAT.  (Id., ¶¶ 23-28).  He found that all 3,490 of the files had non-matching last accessed dates, and all but 172 had non-matching last created dates.  (Id., ¶¶ 25, 27).  The last modified dates matched for 2,479 of the 3,490 files.  (Id., ¶ 26).  According to Mr. Regard, "[w]ithout more information on how the Defendants extracted the date information reflected in the Replacement DAT file, and how the Defendants collected (and maintained) the files themselves, it is difficult to explain the[se] inconsistencies." (Id., ¶ 28).

On July 26, 2013, Teledyne requested Defendants to produce "a forensically sound duplicate of any forensic or logical image(s) of [the 18 electronic storage devices], and if a forensic or logical image was not made, produce a forensically sound duplicate of whatever electronic copy was made." (Doc. 120-3, p. 3).  Teledyne also requested production "for forensic inspection and copying all original devices such as any computer(s), hard drive(s), thumb drive(s), and any other device(s) which contained files reflected on CAA00014446 – CAA00014532." (Doc. 120-3, p. 4).  Defendants objected on the grounds that the parties had "agreed to a procedure for which they would produce

---

[3] To do this, Mr. Regard used LAW Pre-Discovery, an "industry standard processing tool." (Doc. 120-5, ¶ 24).  In his declaration submitted as an exhibit to Teledyne's reply, Mr. Regard explains that

> LAW first attempts to extract application metadata stored within a file.  If LAW does not identify application metadata, it extracts operating system metadata.  The operating system metadata, however, is pulled from the system used by LAW to process the files and does not reflect the operating system metadata of the locations from which the native files were produced.

(Doc. 145-1, p. 4 n. 2).

Electronically Stored Information" and that "Defendants have already produced to Teledyne ESI in the format agreed to." (Doc. 120-3, p. 4). On August 30, Teledyne moved to compel production responsive to these two requests. It amended its motion to compel on September 11. (Docs. 118, 120).

Teledyne contends that it needs access to Defendants' electronic devices or forensically sound duplicates of those devices because the Replacement DAT, "in the view of [Teledyne's] expert Daniel L. Regard, reflects unreliable and/or erroneous information about the files in question." (Doc. 120, p. 3). Teledyne argues that the Replacement DAT, the chart, and the letter accompanying them failed to "explain in any way what the chart was intended to communicate." (Doc. 120, p. 2). Teledyne maintains that the chart (and thus the Replacement DAT) "contain[ed] metadata from native files previously produced by Defendants, which in many cases was different from and in other cases was not even included with the native files originally produced by Defendants." (Id.)

In their response, Defendants note that the parties agreed to produce only native files, and not the devices where the files are stored. (Doc. 131, p. 4-5 ). Defendants also deny that there is any inconsistency in the data they produced. (Doc. 131, p. 6). They point to a declaration by their expert, Chad M. Gough, explaining that differences in dates from metadata on a file system and dates from metadata "collected directly from native files" are to be expected. (Doc. 131, p. 6; Doc. 131-11). Defendants also contend that many of the devices in question contain Dr. Cairns' private information which bears no relevance to this litigation. (Doc. 131, p. 7). Finally, Defendants argue that re-opening discovery as Teledyne requests would subject them to "a tremendous additional and unnecessary burden." (Doc. 131, p. 8).

In its reply, Teledyne asserts that on August 31–the day after it filed its motion to compel–Defendants informed it that the Replacement DAT and chart were created from "system metadata as opposed to the metadata included in the native files." (Doc. 143, p. 2). Teledyne disputes that the information it is requesting will impose a burden on Defendants, and has offered to incur the expense for a third-party vendor to perform the inspection. (Doc. 145, pp. 3-4). It also takes exception to Defendants' accusation that it unjustifiably delayed in requesting production of the devices or a forensically sound duplicate. (Doc. 145, p. 3). Teledyne insists that it only learned of the need for further investigation upon receiving Mr. Regard's report identifying inconsistencies between the Replacement DAT and the metadata in the native files. (Doc. 145, p. 3).

Attached to Teledyne's reply is a second declaration by Mr. Regard which explains what Teledyne hopes to gain from inspection of the electronic devices. (Doc. 145-1). First, he says Teledyne will be able to verify the accuracy of the system metadata provided in the Replacement DAT. (Id.) Second, Teledyne will be able to "examine a wide range of information . . . far beyond the native files," from which it can "identify, verify, and trace Defendants' possession, use and modification of the files over time." (Id.) Third, Teledyne intends to perform a "link file analysis, which can help determine whether files of interest were accessed or opened, when such files were accessed, and where the files resided." (Id. p. 6).

Federal Rule of Civil Procedure 26 states that "parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense," unless a court order provides otherwise. FED.R.CIV. P. 26(b)(1). This broad authorization reflects the intent of the discovery rules that trials in federal courts should be a search for

the truth and should not be "carried on in the dark."  Hickman v. Taylor, 329 U.S. 495, 501 (1947).

Although the courts accord the discovery rules "a broad and liberal treatment," id. at 507, there are limits to what a party may discover.  A court "must limit the frequency or extent of discovery" upon determining that what is sought is unreasonably cumulative or duplicative or more reasonably obtainable from another source; that the requesting party has had ample opportunity to obtain information; or that the burden of the proposed discovery outweighs the likely benefits, "considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." FED.R.CIV.P. 26(b)(2)(C).

Requests for the production of documents and ESI are governed by Rule 34. Parties may serve on each other requests "to produce and permit the requesting party . . . to inspect, copy, test, or sample . . . designated documents or electronically stored information–including writings, drawings, graphs, sound recordings, images, and other data or data compilations"–that are in the other party's possession.  FED.R.CIV.P. 34(a)(1)(A).  Requests for the production of ESI "may specify the form or forms in which the electronically stored information is to be produced." FED.R.CIV.P. 34(b)(1)(C).  But, unless the court orders otherwise, a party need not produce the same ESI in more than one form. FED.R.CIV.P. 34(b)(2)(E)(iii).

Discovery in federal court is a "self-managed process."  Inland American (LIP) SUB, LLC v. Lauth, No. 1:09-cv-00893-SEB-JMS, 2010 WL 670546, at *1 (S.D. Ind. Feb. 19, 2010).  Here, the parties reached an agreement regarding the discovery of ESI.  At a preliminary pretrial conference, they agreed that Defendants would give Teledyne native files and "let them . . . tease out whatever metadata they want."  (Doc. 41, pp. 17-18).  On

May 31, counsel for Teledyne referenced this agreement in a letter to counsel for Defendants.  (Doc. 131-1) ("Teledyne agreed to accept them in that manner as an accommodation to Defendants, not because that is how Teledyne wanted them").[4]

Teledyne argues that the parties' agreement was not intended to preclude them from requesting additional ESI if there is a "good reason" for doing so.  Teledyne believes the alleged errors or inconsistencies in the metadata provided by Defendants constitute good reason.  Defendants insist that there are no errors or inconsistencies in the metadata.

At bottom, the parties' disagreement is one about the nature of metadata and what words mean.  "Metadata" means data that describes other data.  Netword, LLC v. Centraal Corp., 242 F.3d 1347, 1354 n.2 (Fed. Cir. 2001).  Broadly speaking, there are two kinds of metadata: "application metadata" (also "document metadata") and "system metadata."  (Doc. 131-11, ¶¶ 12-13; Doc. 145-1, ¶¶ 5, 6); The Sedona Conference Working Group on Electronic Document Production, The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document production, p. 60 (2d. ed 2007) [hereinafter "Sedona Principles"], available at https://thesedonaconference.org/download-pub/81.

"Application metadata is metadata created as a function of the application software used to create the document or file."  Sedona Principles, p. 60.  Application metadata may convey information to the computer about how to display a file (e.g. fonts and spacing), properties of the document itself (e.g. the file's author), or other information including comments and prior edits.  Id.; (Doc. 131-11, ¶ 13; Doc. 145-1, ¶ 6).  For some

---

[4] This agreement is enforceable under Local Rule 4.15(a), which requires that any "stipulation or agreement" between parties or their counsel "in relation to any aspect of any pending case" must be "made before the Court and noted in the record" or "reduced to writing and subscribed by the party or attorney against whom it is asserted."

files, application metadata may also contain information about when a document was created, viewed, saved, or printed.  See Eoghan Casey, Handbook of Digital Forensics and Investigation, p. 231 (1st ed. 2009).  The information contained in application metadata depends on the type of file and the application used to create the file. Application metadata is part of the file itself, and when a file is moved or copied, the application metadata does not typically change but instead "moves with the file."  (Doc. 131-11, ¶ 14; Doc. 145-1, ¶ 6); Sedona Principles, p. 60.

System metadata is information created by a computer's operating system or by the user and which is maintained by the operating system.  (Doc. 131-11, ¶ 12; Doc. 145-1, ¶ 5); Sedona Principles, p. 60.  System metadata may identify a file's location in storage (its "path"), along with time and date stamps indicating when the file was created and when it was last opened or changed.  (Doc. 131-11, ¶ 13; Doc. 145-1, ¶ 5); Sedona Principles, p. 60.  System metadata is typically located on a different part of the computer's hard drive from the file itself.  (Doc. 145-1, ¶ 5).  Copying or moving a file alters system metadata.  The file name or path must change, and other fields–such as date created and date last accessed–may change as well.  (Doc. 120-5, ¶ 20; Doc. 131-11, ¶ 15). As Mr. Regard explains, when "a file is copied and then saved to a new location, it is treated as a new file and a new created date is set (i.e., as the date it is created in the new location)."  (Doc. 120-5, ¶ 20).  On Windows file systems, moving (by clicking-and-dragging or cutting-and-pasting) a file on the same device or between devices updates the accessed date, but not the created or modified date.  Eoghan Casey, Digital Evidence and Computer Crime: Forensic Science, Computers, and the Internet, p. 525 (3d ed. 2011).

System metadata date and time stamps are not "convenient little recordings of user activity," but "references mostly used by the operating system for its own arcane purposes." John R. Vacca, Computer and Information Security Handbook, p. 582 (2d ed. 2012). Ordinary user activity can alter system metadata in ways that may seem counterintuitive. Casey, Handbook, at 230 ("The behavior of Windows date-time stamps can vary wildly depending on the exact action taken with a file or folder"). Merely placing the mouse over a file name in Windows Explorer can update a file's last accessed date. Id., p. 231. Software can also affect system metadata date and time stamps in different ways. Id., p. 230.

Comparing dates in application metadata with dates in system metadata is not an apples to apples comparison. For each file on a file system, the metadata will contain created, last modified, and last accessed dates. But application metadata will not necessarily contain corresponding fields, and even if it does, the application metadata may not convey the same information as the system metadata. Application metadata date stamps in Microsoft Office files, for example, are "much less susceptible to causal modification" than system metadata date stamps. Casey, Handbook, p. 232. And, generally speaking, file-system level activities like moving or copying a file will update one or more system metadata dates but leave application metadata dates unchanged.

Differences between application metadata dates and system metadata dates are therefore not unusual. A discrepancy between the system metadata date created and the application metadata date created does not mean that one or the other is "unreliable" or "erroneous" (Doc. 120, p. 3). Each more than likely reflects the correct date on which the "file" was created, depending on which sense of the word "file" is used. Casey, Handbook, p. 232. System metadata refers to the "file" in the sense of "that particular

collection of data which is at this particular location in storage."  Application metadata refers to the "file" in a more general sense—e.g., "this document, which was created by an attorney last Thursday on some other computer using Microsoft Word."

Because system metadata date stamps and application metadata date stamps convey different information, discrepancies between them are not necessarily cause for concern or suspicion.  Teledyne has not adequately explained why the discrepancies between system and application metadata[5] for the documents produced are cause for concern or suspicion in this case.  Mr. Regard's report merely states that he cannot explain the discrepancies without more information, without explaining why these discrepancies cry out for further explanation or even suggesting that they are unexpected or unusual.  (Doc. 120-5, ¶ 28).

In his declaration—completed after Teledyne says it first learned that the native files contained system metadata[6]—Mr. Regard states that he "is not able to verify the accuracy of the operating system metadata dates" in the Replacement DAT, and that he could do this if given the opportunity to inspect the forensic copies of the 18 devices. (Doc. 145-1,

---

[5] It is possible that the comparison Mr. Regard performed was not entirely between application metadata from the native files and system metadata as represented in the Replacement DAT.  LAW, the software program Mr. Regard used to extract metadata from the native files extracted application metadata date stamps only from those files which contained application metadata date stamps corresponding to dates modified, accessed, and created.  (Doc. 145-1, p. 4, n. 2).  If LAW does not find application metadata in a particular file, it uses system metadata for the files "from the system used by LAW to process the files," which "does not reflect the operating system metadata of the locations from which the native files were produced.  (Id.).  Mr. Regard's report does not identify how many of the extracted dates are from application metadata and how many are from system metadata.

[6] Teledyne's claim that it did not know what kind of metadata it was dealing with is not credible.  Mr. Regard's report states that modified, accessed, and created dates "are external to the file and stored elsewhere by the operating system," and that "[f]or this reason, it is common to see them included in the DAT file even when the files produced are in native format."  (Doc. 120-5, ¶ 15).  Mr. Regard also noted that "[i]nconsistencies can emerge when operating system metadata is no longer in sync with application metadata.  (Id. ¶ 28).  And as Defendants' counsel pointed out at the hearing, Mr. Regard should have realized he was dealing with system metadata because the Replacement DAT contained a field for file path (which is typically included in system metadata but not application metadata).  If, despite the file path information, Teledyne was unsure, it could have asked Defendants whether the metadata provided in the Replacement DAT and the chart was system metadata.

¶¶ 9, 11).  He does not, however, express any opinion that the information in the Replacement DAT is inauthentic, and Mr. Gough's declaration states that the Replacement DAT "contains a true and accurate copy of the dates and times of the files contained in the forensic images of the Cairns media."  (Doc. 131-11, ¶ 16).  All Teledyne has offered to controvert this is the discrepancy with application metadata dates.  Since application metadata dates and system metadata dates may diverge in the course of ordinary computer use, the discrepancies do not undermine the authenticity of the information in the Replacement DAT.  Bald speculation as to the accuracy of the Replacement DAT dates is not "good reason" for allowing Teledyne more discovery than the parties bargained for.

Although counsel for Teledyne focused on the differences between application metadata and system metadata dates at the hearing, Mr. Regard made other findings in his report that arguably support Teledyne's request.  Based on the system metadata in the Replacement DAT, Mr. Regard determined that "[Dr.] Cairns appears to have had possession of, for the period subsequent to December 31, 2009, documents that were originally created, modified or accessed during the course of [Dr.] Cairns' employment by Teledyne prior to his December 31, 2009 termination date."  (Doc. 120-5, ¶ 16).  Mr. Regard also opined that "[Dr.] Cairns appears to have modified or accessed certain files" after December 31, 2009.  (Id.).  He concludes that Dr. Cairns probably "moved . . . files within his possession to new storage device locations during his employment with Teledyne and during the two-year period following his termination."  (Id., ¶ 21).

In other words, according to Mr. Regard, Dr. Cairns has files that he created before 2010; he has modified or accessed some of those files since 2010; and he moved some of those files to another device before and during 2010 and in 2011.  These activities do

not strike the Court as remarkable; indeed, they seem remarkably ordinary.  These observations do not amount to "good reason" to broaden discovery beyond what the parties initially agreed.  The Court does not doubt that Mr. Regard cannot conduct a proper forensic analysis "trac[ing] Defendants' possession, use and modification of the files over time" without forensic images of the 18 devices from which native files were produced and any other devices which may have contained the files in the past.  But Teledyne is not entitled to such a forensic analysis.

Teledyne's offer to assume the cost of a vendor to perform the additional discovery does not change the outcome.  Expanding the scope of discovery will still impose a significant financial burden on Defendants.  According to Mr. Regard, the third-party vendor's examination is conducted "subject to the monitoring of the producing party." (Doc. 145-1, ¶ 17).  Counsel, perhaps with the assistance of experts, will have to reach an agreement on exactly what the third party vendor can and cannot look for and turn over to Teledyne.  Teledyne's expert may want to supplement his report based on the information found, and Defendants will have to consult their expert regarding any newly uncovered information and any newly disclosed opinions.  This all costs money, and Teledyne has offered to pay only for the third-party vendor and, if necessary, creation of forensic images of the electronic storage devices.

Teledyne's request may also delay resolution of this case.  Defendants' lawyer estimates that the requested discovery will take "months," and Teledyne did not offer a conflicting estimate.  The forensic examination is not a one-off.  Before it starts, counsel will have to negotiate its scope.  After the examination is finished, Teledyne's expert may want to opine about what, if anything, the examination uncovers and then Defendants may want to designate an expert to rebut whatever Teledyne's expert has to say.  And,

compelling the production of Defendants' devices or forensic images of those devices will subject Defendants to the burden of producing the same ESI in more than one form.  This is a burden a party should not ordinarily have to bear.  FED.R.CIV.P. 34(b)(2)(E)(iii).[7]

Finally, it is speculative at best that Teledyne's search will uncover anything useful to its case.  Teledyne asserts that it believes the table is "evidence, when understood and explained by its electronic data expert, that shows Dr. Cairns had possession of Teledyne's property, including Confidential Information, when he was not authorized to do so." (Doc. 120, p. 2).  But, Mr. Regard has not stated or implied that the Defendants possessed or used Teledyne's confidential information.  Teledyne has not identified any particular file thus far produced which contains its confidential information.  "[W]hat Dr. Cairns had, when he had it, and when he modified it" (Doc. 145, p. 3) is only relevant to the extent Dr. Cairns actually had Teledyne's property, and Teledyne hasn't alleged that anything Defendants have produced so far meets that description.[8]

Teledyne's request, which came barely a month before the discovery deadline, seeks to expand discovery well beyond the parameters agreed by the parties.  Indeed, it is beyond what Teledyne sought even at the beginning of the case, when the parties were negotiating the scope and manner of ESI discovery.  (Docs. 26-1, 41).  Teledyne has not shown good reason why it should not be held to its agreement.  Nor has Teledyne shown that the requested discovery is substantially likely to uncover relevant evidence.  Finally, despite Teledyne's offer to pay certain discovery-related costs, allowing the requested

---

[7] Although Teledyne is correct to note that it will obtain new information from the production it seeks, the devices and forensic images will also contain the native files and the system metadata fields included in the Replacement DAT, which Defendants have already produced.

[8] A forensic analysis of Defendants' devices could identify and perhaps even recover files that Defendants may have deleted, and some of these files may be different in content to the files Defendants have already produced.  But this too, is speculative; Teledyne has provided no basis for suspicion that Dr. Cairns ever deleted from any of his storage devices files that are material to this case and which have not already been produced.

discovery would unfairly prejudice Defendants.  Therefore, Teledyne's motion to compel production of forensic images and devices is **DENIED**.

        B.      Production Log

Teledyne also moves to compel Defendants to provide a log organizing the documents they have produced to correspond to Teledyne's requests for production. (Doc. 120, pp. 4-5).  Rule 34(b)(2)(E)(i) provides that, unless the parties stipulate or the Court orders otherwise, "[a] party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request."  Teledyne seeks a production log indicating, for each document produced by Defendants, which request for production the document is responsive to.  (Doc. 120, p. 4–5).

The production log requirement was added to the Federal Rules of Civil Procedure to "prevent part[ies] from obscuring the significance of documents by giving some structure to the production."  Nolan, LLC v. TDC Int'l Corp., Civil Action No. 06-CV-14907-DT, 2007 WL 3408584, at *2 (E.D. Mich. Nov. 15, 2007) (citing Johnson v. Kraft Foods N. Am., Inc., 236 F.R.D. 535, 540 (D. Kan. 2006)).  It forbids "dump truck" discovery tactics, where a party delivers voluminous and poorly organized documents to his adversary, who is forced to rummage through piles of paper in search of what is relevant.  To comply with the rule, a party must "rationally organize[]" its productions, so that the requesting party "may readily identify documents, including ESI, that are responsive to [the] production requests."  City of Colton v. American Promotional Events, Inc., 277 F.R.D. 578, 585 (C.D. Cal. 2011).

Defendants do not dispute the applicability of paragraph (i) to ESI and admit that they have not produced an organized and labeled production log.  (Doc. 131, p. 9).

Rather, they insist that they have produced their documents as they are kept in the ordinary course of business.  (Id.).   Defendants contend that they accomplished this by serving on Teledyne a paper entitled "Defendants' Production Log," (the "Production Log") and accompanying attachments.  (Doc. 120-8).  The Production Log classifies the documents Defendants produced into three categories.  "Category 1 documents" include "[e]lectronic files located on media in Dr. Cairns' custody, control, or possession."  (Doc. 120-8, p. 1).  These were "produced in their native format as agreed to by counsel as they were found in storage."  (Id.)  "As a courtesy," Defendants provided a spreadsheet with "a listing of these files" that "includes metadata for each file identifying the Bates number, the date the file was created, the date the file was last modified, the date the file was last accessed, the name of the file, and [the] file path."  (Id.)  "Category 2 documents" include "e-mails in Defendants' custody, control, or possession" that were "produced natively as agreed by counsel."  (Id.).  Again "[a]s a courtesy," Defendants also provided "a searchable and sortable Excel spreadsheet (the "Production Log Category 2 Spreadsheet") listing the e-mails in chronological order and providing for each e-mail a Bates number, along with certain email metadata.  (Id.)  "Category 3 documents" comprise e-mails and electronic documents that were not produced natively along with "all other production that . . . did not exist in electronic format."  (Id., p. 2).  The Production Log includes a table separating Defendants' production into Bates page ranges, and, for each range, indicating the production log category, custodian, and a brief description of the documents falling within the page range.  (Id., pp. 3-5).  The issue is whether the Production Log and spreadsheets attached to it, in combination with the files Defendants previously produced, qualify as production as kept in the ordinary course of business.

Because businesses have an incentive to keep their documents in a manner that allows ready access, a production of documents as kept in the ordinary course of business should permit a "systemized retrieval of relevant documents." <u>Andritz Sprout-Bauer, Inc. v. Beazer East, Inc.</u>, 174 F.R.D. 609, 630 (M.D. Pa. 1997).  This requires a party to organize its production in such a way as to enable the requesting party to substantially replicate the system used by the producing party, whether the production is ESI or paper documents.  <u>Pass & Seymour, Inc. v. Hubbell, Inc.</u>, 255 F.R.D. 331, 335 (N.D.N.Y 2008).  For example, if a party keeps responsive documents or ESI "in a way that makes it searchable by electronic means, the information should not be produced in a form that removes or significantly degrades this feature."  FED R. CIV. P. 34, Advisory Committee Notes, 2006 Amend.

 "The most obvious means of complying with the [usual course of business requirement] is to permit the requesting party to inspect the documents where they are maintained, and the manner in which they are organized by the producing party." <u>Pass & Seymour</u>, 255 F.R.D. at 336.  For documents stored electronically, producing a forensic duplicate of a storage device is also sufficient.  If a party chooses to produce files but not the devices (or forensic copies of the devices) on which the files are stored, the manner of production determines whether the files are produced as they are kept in the usual course of business.  To satisfy the usual course of business requirement, the mode of production should preserve the functional utility of the electronic information produced.  As the

following discussion shows, this normally requires (1) preserving the format of the ESI[9]

and (2) providing sufficient information about the context in which it is kept and used.[10]

Production "as kept in the ordinary course of business" generally requires turning

over electronic documents in the format in which they are kept on the user's hard drive or

other storage device.  A file that is converted to another format solely for production, or for

which the application metadata has been scrubbed or altered, is not produced as kept in

the ordinary course of business.  See Bray & Gillespie Mgmt., LLC v. Lexington Ins. Co.,

259 F.R.D. 568, 585 (M.D. Fla. 2009) (documents produced as TIFF images, with

metadata removed and search functionality eliminated, not produced as kept in usual

course of business), quashed in part on other grounds, No. 6:07-cv-02222-ORL-35-KRS,

2009 WL 5606058 (Nov. 16, 2009).  If a document is maintained on a hard drive or in a

storage device in the form in which it is created and edited (its "native" format, in the

technical sense of the term), it must be produced in native format to be produced as it is

kept in the ordinary course of business.  See Dahl v. Bain Capital Partners, LLC, 655 F.

Supp. 2d 146, 150 (D. Mass 2009).  Preservation of format is important because

conversion from native format may eliminate or degrade search and other information

processing features (e.g., copy, paste, and sort).  Such features may allow a user to

identify relevant information in a document much more quickly, which would significantly

enhance the value of a document to a business.  Allowing a party to defeat this

functionality would undermine the purpose of producing information as it is kept in the

usual course of business.  Cf. Sedona Principles, p. 4 ("[S]tripping metadata and

---

[9] The Court takes no position on whether production of a document in a converted format would suffice, provided that the converted format preserves all of the information, including metadata, and accommodates all of the functionality (e.g. searching, sorting, etc.) of the original format.

[10] As with production of paper documents, a party must also identify the custodian of electronic documents.  Pass & Seymour, 255 F.R.D. at 334.  Here, Defendants have disclosed that Dr. Cairns is the custodian of all of the Category 1 and 2 documents.  (Doc. 120-8).

embedded data from files such as spreadsheets can substantially impair the functionality of the file and the accuracy of the production as a fair representation of the file as kept and used in the ordinary course of business.")

Second, the producing party must provide information about where the documents are kept and how they are organized. Pass & Seymour, 255 F.R.D. at 334 (producing party must prove that "the documents produced were organized as they are regularly maintained"). For documents stored on a computer or external storage device, this means providing system metadata indicating at least the file name and path for produced files. Valeo Elec. Sys., Inc. v. Cleveland Die & Mfg. Co., No. 08-cv-12486, 2009 WL 1803216, at *2 (E.D. Mich. June 17, 2009); see also City of Colton v. American Promotional Events, Inc., 277 F.R.D. 578, 585 (C.D. Cal. 2011); Sedona Principles, p. 60 ("[S]ystem metadata may allow for the quick and efficient sorting of a multitude of files by virtue of the dates or other information captured in metadata."). The files and system metadata, must be organized in a manner that "permits systemized retrieval" of files based on the metadata. Cf. Andritz Sprout-Bauer, 174 F.R.D. at 630. In other words, the requesting party must be able to search for and readily access files with particular characteristics (e.g. all .doc files in X folder).[11]

For emails, the relevant context is somewhat different. A user typically views emails not in a file browser, but in an email client. While the relevant organizational information for files viewed in a file browser is file name and path, the relevant information

---

[11] Thus, a .pdf file or hard document displaying this information, such as the chart Defendants produced on June 21 Bates labeled CAA00014446–CAA00014532, would be insufficient by itself, because it would not permit "systemized retrieval" of relevant information. The Replacement DAT produced on June 21, however, contains all of this data in digital form. The Replacement DAT, together with the OPT files, placeholder TIFF images, and native files from the June 3 and June 12 productions, (see Doc. 120-5, ¶¶ 8-11), may have given Teledyne all of the information needed to substantially replicate the directory structure of Defendants' electronic devices and systematically retrieve files based on path and filename. But Defendants do not make this argument; and the Court would require more evidence regarding the capability and operation of e-discovery software in order to make such a finding.

in an email client is the date the email was transmitted, perhaps along with the parties to

the email (sender and recipients), and the subject line.  See Valeo, 2009 WL 1803216, at

*2 (to be produced as kept in the usual course of business, emails must be arranged "by

custodian, in chronological order and with attachments, if any").

Citing Valeo, Defendants contend that they have met these requirements as to the

Category 1 documents (non-email ESI produced as native files) by furnishing the

spreadsheet providing the Bates number for the document along with system metadata

identifying date created, date last modified, date last accessed, file name, and path.

(Doc. 131, p. 10).  In response, Teledyne protests that the documents were not produced

"in the order they were on [Defendants' electronic] device[s]." (Doc. 145, p. 5).  As

Teledyne explains,

> [W]ithin the device '1TB Passport USB 3.0'. . ., Defendants
> produced non-email documents Bates numbered
> CAA00000001-29, CAA00011319-13321, and CAA00000030-
> 88. This is obviously not a contiguous production from
> CAA00000001 to CAA00013321; the space from
> CAA00000089 to CAA00013319 is taken up by items from
> other places.

(Doc. 145, p. 5).

Teledyne's argument based on the Bates numbers fails for two reasons.  First, the

jumps in the Bates numbers are not haphazard.  For most of the devices, the files are

arranged in alphabetical order by file path.  For the other devices, the jumps in Bates

numbering are attributable to the fact that some documents from the same directory were

produced on different days.  Taking the documents from the device "1TB Passport USB

3.0," for instance, documents numbered CAA00000001 through CAA00000088 were

produced on June 3 (along with 11,851 documents from other devices), and documents

numbered CAA00013319 through CAA00013321 were produced on June 12 (along with

2,437 documents from other devices).  (Doc. 145, p. 5).  All Category 1 documents produced on June 3 from device 1TB Passport USB 3.0 are Bates-numbered sequentially in alphabetical order by file path, and all the documents produced on June 12 from the device are Bates-numbered sequentially in alphabetical order by file path.  As far as the Court can tell, the same pattern emerges for files produced from every other device except Desktop_HDD.[12]  The upshot is that, for these devices, each of the two daily productions met the standard individually, but in combination, they fell short.  By Teledyne's standard, if Defendants had produced all of the documents from these devices on one day, this would have been "a different story."[13]  The Court does not understand why Defendants' decision to produce native file documents in two batches instead of one should be determinative.  The fact that two documents from the same storage device are produced on separate days does not mean that the two documents are not produced as kept in the usual course of business.[14]

Second, it is the production of system metadata (particularly the file path) and the ability to systematically retrieve files based on the system metadata, and not the Bates numbering, that determines whether electronically stored documents are produced as they are kept in the usual course of business.  To see why this is true, imagine that Defendants had produced these documents in the order Teledyne deemed necessary, but provided no information about file name or path.  Such a production would tell Teledyne next to nothing about how the produced files were kept in the usual course of

---

[12] Desktop_HDD files are broken up into three blocks, rather than two: CAA00001488 to CAA00002166; CAA00012710 to CAA00012779; and CAA00013349 to CAA00014341.  The files in each block are Bates numbered in alphabetical order by file path.  The documents in the first block were produced on June 3; the documents for the second and third blocks were produced on June 12.

[13] At the hearing, counsel for Teledyne conceded that if the Bates numbers were provided sequentially, "that would be a different story."

[14] Indeed, if that were the case, a requesting party could frustrate production "as kept in the usual course" simply by staggering production requests to ensure that documents from the same device had to be produced on different days.

business.  The Bates number conveys no information about how or where the file is kept; it is simply an index that allows cross-referencing the system metadata in the spreadsheet with the separately-provided native file.  The spreadsheet Defendants have produced meets the requirement set forth in Valeo.  Accordingly, the motion to compel Defendants to furnish a production log for the Category 1 documents is **DENIED**.

Turning to the emails produced in native format (Category 2 documents), Teledyne contends that these documents could not have been produced as kept in the ordinary course because they were produced "in non-sequenced fashion"–in other words, not in chronological order.  (Doc. 145, p. 6).  But, as with the Category 1 documents, the order in which the native format emails were produced does not determine whether those emails were produced as kept in the ordinary course of business.  If the native format emails can be sorted by date, the order of production is irrelevant.  The emails themselves should contain the necessary information to permit sorting by date, and much of the information in the spreadsheet may therefore be redundant.[15]  To the extent that the emails don't contain the necessary information, the second spreadsheet furnished the necessary information under Valeo.  Therefore, Teledyne's motion to compel Defendants to furnish a production log is also **DENIED** for the Category 2 documents.

The Category 3 documents consist of converted files and non-ESI documents.  (Doc. 120-8, p. 2).  For the converted files, Defendants have made no showing that conversion preserved relevant application metadata or any important functionality such as searching and sorting.  While they have suggested that Teledyne was permitted to

---

[15] See Request for Comment 5322: Internet Message Format 19, The Internet Society: Internet Engineering Taskforce (P. Resnick, ed., Oct. 2008), available at http://tools.ietf.org/html/rfc5322 (origination date is a required header field); Request for Comment 2822: Internet Message Format 17, The Internet Society: Internet Engineering Taskforce (P. Resnick, ed., Apr. 2001), available at http://tools.ietf.org/html/rfc2822 (same).

inspect some of the non-ESI documents, Defendants have not claimed that inspection was permitted for all non-ESI documents.  The three-page table at the end of the August 28 Production Log offers scant indication of how the Category 3 documents are kept in the ordinary course of business.  Therefore, as to the Category 3 documents, Defendants have failed to meet their burden of showing that these documents were produced as kept in the ordinary course of business and Teledyne's motion is **GRANTED**.  For all Category 3 documents Teledyne did not physically inspect, Defendants must provide a production log, identifying, for each document produced, the request or requests to which the document is responsive.

    III.    Defendants' Motion to Exclude Untimely Expert Reports

    The Case Management and Scheduling Order ("CMSO") set June 3, 2013 as the deadline for Teledyne's expert disclosures and July 3, 2013 as the deadline for all Defendants' expert disclosures.  (Doc. 37, p. 3).  On April 13, 2013 the Court granted the parties' joint motion to extend these deadlines to June 27, 2013 for Teledyne and July 26, 2013 for all Defendants.  (Docs. 61, 63).  On June 27, Teledyne timely served three expert reports prepared by four different expert witnesses.  (Doc. 106, p. 3).  Then, on July 26, 2013, Teledyne served five additional expert reports prepared by six different expert witnesses.  (Id., p. 4).  The new reports are designated as "Counter-Defendant" reports.  (Id.).  Defendants are asking the Court to exclude as untimely the expert reports Teledyne served on July 26, 2013.  (Doc. 106).

    Teledyne argues that its July 26 disclosures were timely because Defendants have counterclaimed against it and therefore, it is also a Defendant for purposes of the expert disclosure deadlines in the CMSO.  (Doc. 108, p. 9).  Alternatively, Teledyne argues that

it had substantial justification for filing late expert reports and the Defendants have not been prejudiced.  (Id., pp. 10-12).

The Court rejects Teledyne's reading of the CMSO.  Throughout the CMSO, the court uses "Plaintiff" to refer to Teledyne and "Defendants" to refer to Dr. Cairns, Abyssal Systems, and the Stillwater Trust.  (Doc. 37).  Construing "Defendants" to mean "Cairns, Abyssal Systems, and Stillwater Trust" in one part of the order but "all parties against whom a claim is pending" in another part would "'contravene . . . normal rules of . . . construction.'"  Douglas v. Yates, 535 F.3d 1316, 1320 (11th Cir. 2008) (quoting Jones v. Bock, 549 U.S. 199, 223 (2007)).  The Order is unambiguous.  June 26 was the deadline for disclosure of all of Teledyne's expert reports, regardless of whether they applied to its claims or the Defendants' counterclaims.

Teledyne's untimely expert reports may still be allowed if the failure to timely serve them was "substantially justified" or "harmless."  FED.R.CIV.P. 37(c)(1).  The determination of whether a party's failure is substantially justified or harmless lies within the "broad discretion" of the Court.  Abdulla v. Klosinski, 898 F. Supp. 2d 1348, 1359 (S.D. Ga. 2012).  In determining whether to allow an untimely expert report under Rule 37(c)(1), the Court considers: (1) the unfair prejudice or surprise of the opposing party; (2) that party's ability to cure the surprise; (3) the likelihood and extent of disruption to the trial; (4) the importance of the evidence; and (5) the offering party's explanation for its failure to timely disclose the evidence.  Mobile Shelter Systems USA, Inc. v. Grate Pallet Solutions, LLC, 845 F. Supp. 2d 1241, 1250-51 (M.D. Fla. 2012). Accord Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003); Abdulla, 898 F. Supp. 2d at 1359.

Defendants contend that they were prejudiced because they did not have an opportunity to depose all of Plaintiffs' experts or discover any of the experts' untimely opinions.  (Doc. 106, pp. 6-7).  The Court disagrees.  Teledyne's untimely expert reports were submitted more than a month before the discovery deadline, giving Defendants more than enough time to take depositions and designate rebuttal experts, if any were needed.  Cf. OFS Fitel, LLC v. Epstein, Becker & Green, P.C., 549 F.3d 1344, 1363-64 (11th Cir. 2008) (reversing as abuse of discretion district court's exclusion of expert report submitted on November 3, because the other party "had ample time to take [the expert's] deposition in November . . . and designate its rebuttal expert").

Teledyne's initial expert disclosures included its own employee, Kenneth Nagengast, a report by Gerald Tourgee and Stephen Fitzpatrick from OCI Group who wrote a technical report on intellectual property issues (the "OCI Report"), and Dr. Edward T. Wolpert, who submitted a report on damages.  (Doc. 108, p. 5).  Teledyne insists that it merely "*resubmitted*" these expert's reports in support of its defense to the counterclaim.  (Id. (emphasis in original)).  It maintains that the resubmitted reports are in virtually identical form, with limited revisions, typo corrections, or other alterations, to the reports it originally produced.[16]

The most extensive of these "limited" revisions are to the OCI Report.  As Teledyne explains it, "two sentences were added on p. 21, eight paragraphs were added on pp. 57-58 that amplified the discussion of competitive impact on Teledyne, and the list

---

[16] The normal course of action for a litigant whose expert wishes to add to an already-disclosed report is to supplement the report under Rule 26(e)(2).  However, Teledyne has not asked the Court to treat the revised reports as Rule 26(e) supplemental reports, and the Court declines to do so.  Even if the Court did, it would not necessarily change the result, for "[Rule] 26(e) does not grant a license to supplement a previously filed expert report [merely] because a party wants to."  Coles v. Perry, 217 F.R.D. 1, 3 (D.D.C. 2003).

of documents reviewed was modified accordingly." (Doc. 108, p. 6).[17]  Defendants argue

that the modifications are more substantial than Teledyne lets on, and that Teledyne has

not offered any reason why its experts did not review the documents and opine on them

in their initial reports.  (Doc. 134, p. 2).  Defendants are correct–Teledyne has offered no

reason for submitting the OCI Report a month past the deadline.  Nor has Teledyne

offered any reason for re-submitting Dr. Wolpert's report–which is apparently identical

(aside from the title) to the report Teledyne disclosed in June.  (Doc. 108, p. 6).  Because

Teledyne has offered no reason why it filed these two reports a month after the deadline,

the Court finds that Teledyne has not shown substantial justification for missing the

deadline or that its untimely submission of these reports was harmless.  Accordingly,

Defendants' motion is **GRANTED in part** and the "Counter-Defendant" reports of the OCI

group and Dr. Wolpert are **EXCLUDED**.  For these experts, Teledyne should cite only the

reports it disclosed on June 27.

The other two reports were prepared by Mr. Regard and attorney Charles I. Nash.

Both reports are relatively short, and the subjects on which they opine are not obscure.

Teledyne explains that it was unable to sooner produce Mr. Regard's report because the

Defendants did not provide the Replacement DAT, which Mr. Regard's report is largely

based on, until June 21, six days before Teledyne's deadline.  (Doc. 108, p. 1).  At the

hearing, counsel for Teledyne added that, between the day Teledyne received the chart

and Replacement DAT and the June 27 deadline, counsel was preoccupied with

depositions.  Defendants maintain that the native files were provided earlier in June, and

---

[17] The added sentences on page 21 offer additional in reasons why the experts believe that Dr. Cairns's pending patent application "resulted from work that led to the Company's U.S. Patent 6,067,395." The new paragraphs on pages 57-59 explain how Dr. Cairns's licensing the patent application to a smaller company would harm Teledyne.

Mr. Regard had more than enough time to complete his analysis.[18]  (Doc. 133, p. 4).

Teledyne's reason is not, as Defendants suggest, a "manufactured" excuse.  (Doc. 133,

p. 3).  Most of Mr. Regard's report addresses the system metadata in the Replacement

DAT, and it is not reasonable to expect him to have considered this evidence and

addressed it in an expert report in less than a week.  And, counsel for Defendants all but

conceded that it was not prejudiced by Mr. Regard's report when he suggested at the

hearing that "it would have made no sense" for Defendants to depose Mr. Regard,

because they agree with his observation that "the dates [from system and application

metadata] are different."  Given the potential importance of Mr. Regard's testimony to the

case and the absence of any unavoidable prejudice, the Court finds that Teledyne had

substantial justification for submitting Mr. Regard's report when it did.  Therefore, the

motion to strike Mr. Regard's expert report is **DENIED**.

Mr. Nash has offered his expert opinions about the Stillwater Trust.  Teledyne

attributes its delay in submitting his report to the fact that Defendants did not produce all

of the requested Trust documents until June 19, eight days before the deadline, and that

the documents Defendants did produce were heavily redacted and not particularly useful.

(Doc. 108, p. 4).  Defendants blame Teledyne for this predicament, as Teledyne did not

submit the last of its discovery requests regarding the Trust until June 3. (Doc. 133, p. 4).

The Court finds that Teledyne has offered good reason for missing the deadline for Mr.

Nash's report and, given the absence of unavoidable prejudice, that Teledyne had

substantial justification for submitting Mr. Nash's report when it did.  Therefore, the motion

to strike Mr. Nash's expert report is **DENIED**.

IV.    Defendants' Motion to Compel Entries on Teledyne's Privilege Log

---

[18] At the hearing, counsel for Defendants insisted that this analysis should not have taken Mr.
Regard more than a day, but didn't provide any support for this assertion.

On March 13, 2012, Teledyne directed inside and outside counsel to begin the investigation that led to the filing of this lawsuit.  (Doc. 128, p. 1-2).  Teledyne has compiled and served a 340 page privilege log which ends March 12, 2012.  (Id., p. 1).  Its position is that it should not have to produce a privilege log for any communications made during the almost three month period between the commencement of its investigation and June 6, 2012, when it filed suit.  It argues that requiring it to submit a privilege log for this time frame would be unduly burdensome and not likely lead to the discovery of relevant information.  (Doc. 128, p. 3).  Defendants disagree and are requesting an order compelling Teledyne to produce a privilege log of withheld documents created between March 13 and June 6, 2012.  (Doc. 111, p. 1).  At the hearing, counsel for Defendants alleged that Teledyne did not make an adequate investigation before filing suit.  He also said he only wants a privilege log of withheld communications between Teledyne's business people and its counsel.  He stated that he is not trying to pierce the attorney-client privilege at this time, but the number of documents "raise concerns."

A party that withholds information on the grounds of privilege must "describe the nature of the documents, communications, or tangible things not produced or disclosed— and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." FED.R.CIV.P. 26(b)(5)(A)(ii).  Counsel typically satisfy this requirement by creating and producing a privilege log, listing the documents withheld along with the pertinent information for each document.  The parties can agree to deviate from this norm, cf. FED.R.CIV. P. 29, including by agreeing to log only privileged communications and attorney work product generated before the litigation commences.  U.S. v. Cinergy Corp., No. 1:99-cv-1693-LJM-JMS, 2008 WL 5424007, at *4 (S.D. Ind. Dec. 30, 2008) (enforcing agreement between parties exempting post-filing

communications from logging).  The court may infer acquiescence to such an arrangement from a party's silence in the face of such omissions.  Mattel, Inc. v. MGA Entertainment, Inc., No. CV 04-9049 DOC (RNBx), 2010 WL 3705782, at *1 (C.D. Cal. Aug. 3, 2010) ("The Court is satisfied that it has been the long-standing practice between the parties that post-filing documents need not be marked as privileged.").

Courts divide over whether parties must log post-filing communications absent an agreement.  Some courts require parties to log post-complaint communications.  See, e.g., Horton v. United States, 204 F.R.D. 670, 673 (D. Colo. 2002); Tyco Healthcare Group LP v. Mutual Pharmaceutical Co., Civil Action No. 07-1299 (SRO)(MAS), 2012 WL 1585335 (D.N.J. May 4, 2012); PostX Corp. v. Secure Data Motion, No. C 02-04483 SI, 2004 WL 2623234 (N.D. Cal. Jun. 9, 2004).  These decisions often point to the plain language of Rule 26(b)(5), which makes no distinction between pre-filing and post-filing material.  Horton, 204 F.R.D. at 673.

Other courts have declined to require the logging of privileged, post-filing documents.  See Douglas C. Rennie, Why the Beginning Should be the End: The Argument for Exempting Postcomplaint Materials From Rule 26(b)(5)(A)'s Privilege Log Requirement, 85 Tul. L. Rev. 109, 133 n.155 (2010) (collecting cases).  At least two federal district courts have adopted local rules exempting post-complaint communications from the scope of discovery.  S.D. FLA. LOCAL. R. 26.1(g)(3)(C); N.D. OKLA. LOCAL CIV. R. 26.4.  One judge explained that the Southern District of Florida's rule reflects "a policy decision . . . that[] despite the relevancy of a given document, in most cases, there is no good reason to require a party to go through the expense of a privilege log with respect to documents created after the commencement of a case."  Stern v. O'Quinn, 253 F.R.D. 663, 689 (S.D. Fla. 2008).

Very few decisions, however, allow parties to unilaterally dispense with pre-complaint logging, at least of certain communications.  Teledyne cites iSmart Int'l Ltd. v. i-DocSecure, LLC, No. C 04-03114 RMW (RS), 2006 WL 2263910 (N.D. Cal. Aug. 8, 2006), where the district court permitted a plaintiff to omit from its privilege log pre-complaint materials generated "in direct connection with preparation for litigation" but required logging of communications "generated after the parties' dispute arose but before litigation became inevitable, or otherwise unconnected with preparation for litigation."  Id. at *3 (emphasis in original).  Teledyne asks this Court to go even further and not require it to log any documents generated between the date its investigation began and suit was filed.  Teledyne's position is inconsistent with Rule 26 and the case law.  Accordingly, Teledyne must submit a privilege log of withheld information up to June 6, 2012 when it filed suit.

An itemized privilege log is not always necessary to assess whether a communication is protected.  As the Advisory Committee Note to Rule 26 explains, "[d]etails concerning time, persons, general subject matter, etc., may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged or protected, particularly if the items can be described by categories."  146 F.R.D. 401, 639.  Teldyne offers good reasons why it should not have to individually log all pre-litigation correspondence.  (See Doc. 128, p. 2).  And, Defendants' explanation for seeking the privilege log is not unpersuasive.  (See Doc. 111, p. 2).

In some circumstances, a party may substitute categorical privilege logging for document by document privilege logging.  Categorical privilege logging entails "describing by category the documents withheld on privilege grounds."  United States v.

KPMG, LLP, 237 F. Supp. 2d 35, 37 (D.D.C. 2002); see also SEC v. Thrasher, No. 92

CIV. 6987 (JFK), 1996 WL 125661, at *1 (S.D.N.Y. Mar. 20, 1996).  The Court has the

discretion to allow a party to produce a categorical privilege log.  KPMG, 237 F. Supp. 2d

at 37 (citing United States v. Gericare Med. Supply, Inc., No. CIV.A.99-0366-CB-L, 2000

WL 33156442, at *3-4 (S.D. Ala. Dec. 11, 2000)).  "A categorical log may be used where

'(a) a document-by-document listing would be unduly burdensome and (b) the additional

information to be gleaned from a more detailed log would be of no material benefit to the

discovering party in assessing whether the claim is well-grounded.'" In re Rivastigme

Patent Litigation, 237 F.R.D. 69, 87 (S.D.N.Y. 2006) (quoting Thrasher, 1996 WL 125661,

at *1).  The sufficiency of a categorical privilege log turns on whether the categories of

information are sufficiently articulated to permit the opposing party to assess the claims of

privilege or work product protection.

     The Court finds that a categorical privilege log of documents created between

March 13 and June 6, 2012, which have been withheld on the basis of privilege or

protection, is sufficient.  The log shall organize the documents into categories which

provide sufficient information to permit Defendants to assess the validity of the claim of

privilege or protection Teledyne is asserting for each category.

     V.    Defendants' Motion to Exclude Expert Rebuttal Reports

     Defendants served James L. Cairns' Corrected Expert Rebuttal Report ("Dr.

Cairns's Report") on July 31 and Teledyne served its "Rebuttal Report to James L.

Cairns' Corrected Expert Rebuttal Report" ("OCI Rebuttal Report") on August 26, 2012.

(Doc. 112, p. 3; Doc. 126, p. 2).  Defendants' are asking the Court to exclude the OCI

Rebuttal Report on the ground that it is untimely.  (Doc. 112, p. 3-4).  Teledyne argues the

report is timely because it was submitted within 30 days after Dr. Cairns's Report, as

required by Rule 26(a)(2)(D)(ii).  (Doc. 126, p. 1).  Defendants in turn maintain that the OCI Rebuttal Report is not actually a "rebuttal" report.  They claim that it is a "further opening report primarily addressing information that could have been disclosed within the time set for [Teledyne's) initial expert report."  (Doc. 112, p. 4).

Rule 26(a)(2)(D)(ii) provides that "[a]bsent a stipulation or court order," a party must disclose rebuttal expert witness reports "within 30 days after the other party's disclosure," if the evidence offered in the report "is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)."  For the disclosure of a rebuttal report to be timely under this provision, three things must be true: (1) no stipulation or court order must provide otherwise; (2) the report must be served within 30 days of the report to which it is responding; and (3) the report must be bona-fide rebuttal, that is, it must be "intended solely to contradict or rebut evidence on the same subject matter identified by" an opposing expert. FED. R. CIV. P. 26(a)(2)(D)(ii).

Defendants argue that the CMSO supersedes Rule 26(a)(2)(D), and because the CMSO does not make a distinction between initial and rebuttal reports, it applies to both. Teledyne contends that the court should not read the CMSO to abrogate a party's right to secure expert evidence in rebuttal.  The Court agrees with Teledyne.  The CMSO's failure to set a deadline for the disclosure of rebuttal expert witness reports does not mean that rebuttal expert witness reports are not permitted.  It simply means that rebuttal expert witness reports must be submitted within the period set forth in Rule 26(a)(2)(D)(ii). See McMahon v. Presidential Airways, Inc., No. 6:05-cv-1002-Orl-28GJK, 2009 WL 2151316, at *1 (M.D. Fla. July 14, 2009) ("Because the Court has not ordered any deadlines for the disclosure of rebuttal witnesses, the general provision of Rule [26(a)(2)(D)(ii)] applies."). This is the prevailing rule in this circuit and throughout the country.  See, e.g., A & J Mfg.,

LLC v. Kingsford Prods. Co., 2:09-049, 2010 WL 1956042, at *2 (S.D. Ga. May 13, 2010); SEC v. Badian, No. 06 Civ. 2621(LTS)(DFE), 2009 WL 5178537, at *4 (S.D.N.Y. Dec. 23, 3009); Mayou v. Ferguson, 544 F. Supp. 2d 899, 901 (D.S.D. 2008); Smith v. Jacobs Engineering Group, Inc., No. 4:06-cv-496, 2008 WL 5351047, at *1 (N.D. Fla. Dec. 15, 2008); IBM v. Fasco. Indus., Inc., C-93-20326, 1995 WL 115421, at *2 (N.D. Cal. Mar. 15, 1995). Teledyne timely served the OCI Rebuttal Report within 30 days of Dr. Cairns's Report and therefore, it is admissible so long as it is a bona fide rebuttal report.

Defendants argue that the OCI Rebuttal Report is in reality, an original report that Teledyne concealed until two days before Defendants deposed one of the report's authors and less than a week before the close of discovery. (Doc. 112, p. 4). Defendants claim that the OCI Rebuttal Report is not bona-fide rebuttal because it "address[es] information that could have been disclosed" in the experts' original report and discusses matters that the expert had reviewed and considered during the preparation of the original report. (Id.). The test under Rule 26(a)(2)(D)(ii) is not whether a rebuttal report contains new information, but whether it is "intended solely to contradict or rebut evidence on the same subject matter" of an opponent's expert report. See Lott v. ITW Food Equip. Gp., LLC, 2013 WL 3728581, at *21-22 (N.D. Ill. July 15, 2013); see also Crowley v. Chait, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (expert may include material in rebuttal report even though material could have been included in initial report). The rules do not require parties or their expert witnesses to anticipate all foreseeable opposing arguments and meet those arguments in their initial reports. "Such a rule would lead to the inclusion of vast amounts of arguably irrelevant material in an expert's report on the off chance that failing to include any information in anticipation of a particular criticism would forever bar

the expert from later introducing the relevant material." Crowley, 322 F. Supp. 2d at 551.

"All that is required is for the information to repel other expert testimony." Id.

The OCI Rebuttal Report is a bona fide rebuttal report to Dr. Cairns's Report.  It mentions "Dr. Cairns' Rebuttal" or "Dr. Cairns' Rebuttal Report" more than 30 times and it frequently quotes passages or reproduces tables or diagrams from Dr. Cairns's Report. The entire second half of the OCI Rebuttal Report takes the form of alternating quotations from Dr. Cairns's Report and critiques of those passages by Teledyne's experts. Accordingly, the motion to exclude the OCI Rebuttal Report is **DENIED**.

VI.    Conclusion

Accordingly:

1.  Teledyne's Amended Motion to Compel Production of Forensic Images and Devices and a Production Log (Doc. 120) is **GRANTED IN PART** and **DENIED IN PART**.  Within 14 days from the rendition of this Order, Defendants shall produce a production log identifying, for each document, the request or requests to which the document is responsive, listing all Category 3 documents that Teledyne did not physically inspect.

2.  Teledyne's Motion to Compel Production of Forensic Images and Devices and a Production Log (Doc. 109) is **DENIED** as moot.

3.  Defendants' Motion to Exclude Teledyne's Untimely Expert Reports and Related Testimony is **GRANTED IN PART** and **DENIED IN PART**.  The "Counterdefendant Expert Reports" of the OCI experts and Dr. Wolpert are **EXCLUDED**.

4.  Defendants' Motion to Compel Entry on Teledyne's Privilege Log of Certain Documents Predating the Filing of the Lawsuit (Doc. 111) is **GRANTED**.

Teledyne shall produce a categorical privilege log for the period between March 12, 2013 and the date of filing of this lawsuit.  The privilege log need not itemize every communication but may assert privilege for documents categorically, as long as the category descriptions allow Defendants and the Court to assess the claim of privilege.

5.  Defendants' Motion to Exclude Expert Rebuttal Reports (Doc. 112) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on October 25, 2013.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to Counsel of Record